**UNITED STATES of America, Plaintiff,**

v.

**Charles Robert TALBOTT, D. D. S. and Clayborn C. Taylor, D. D. S., Defendants.**

**No. CR–2–77–92.**

United States District Court, S. D. Ohio, E. D.

March 3, 1978.

---

Daniel A. Brown, Asst. U. S. Atty., Columbus, Ohio, for plaintiff.

Jack R. Graf, Jr., Joel R. Campbell, Columbus, Ohio, for defendants.

## OPINION

DUNCAN, District Judge.

On September 27, 1977, the Special Grand Jury returned a 14-count indictment charging these defendants with conspiracy to commit offenses against the United States, 18 U.S.C. § 371 (Count I), and with mail fraud, 18 U.S.C. § 1341 (Counts II–XIV). Thereafter each defendant made a knowing and voluntary waiver of his right to trial by jury, and this action was tried to the Court. The Court's findings of fact are contained herein in accordance with Fed.R.Crim.P. 23(c).

### I

Doctors Talbott and Taylor attended The Ohio State University College of Dentistry from 1972 to 1975. Dr. Talbott was licensed to practice dentistry in the State of Ohio in November 1975. Dr. Taylor was licensed to practice dentistry in the State of Ohio in February 1976.

In January 1976 the defendants leased office space located at 1004 South Parsons Avenue, Columbus, Ohio. During the period from April 4, 1976, through June 24, 1977, the defendants engaged in the general practice of dentistry at this location, known as the South Side Dental Clinic. Approximately 95% of the defendants' patients were receiving public assistance during the time of their treatment at the South Side Dental Clinic.

Both defendants participated in the State of Ohio Department of Public Welfare Medical Assistance Program (Medicaid). This program is a joint federal-state program under Title XIX of the Social Security Act. As providers in the Medicaid program, the defendants received a copy of the dental services handbook prepared by the Ohio Department of Public Welfare. This handbook describes the procedure for participation in the Medicaid program, covered services, allowable charges and services which require prior authorization in order to be reimbursed.

After rendering services, which do not require prior authorization, providers must complete an invoice indicating pertinent information concerning the provider, the recipient and the services rendered. Brenda Krann, who is employed by the defendants as a receptionist at the South Side Dental Clinic, testified that she prepared the invoices at issue in this case from the information recorded on the patient folder by the defendants. She further testified that each defendant reviewed the invoices for his work and signed the invoice. These invoices were then mailed to the Ohio Department of Public Welfare.

When invoices are received by the Department of Public Welfare the information contained thereon is entered into both microfilm and computer data storage systems. The invoice is then sent to the state auditor's office for the preparation of a warrant in the amount of allowable reimbursement shown on the invoice. These warrants are then mailed to the provider unless a "hold" has been placed on a provider's warrants. Such a "hold" was placed on certain warrants intended for each of these defendants, and these warrants were not mailed to the defendants. Each of the warrants described in the indictment, however, was mailed to the addressee as shown.

Each of the defendants received warrants prepared and distributed by mail in response to invoices which he signed and caused to be mailed to the Department of Public Welfare  These warrants, including those described in the indictment, were mailed to, and received at the home address of each defendant, rather than the South Side Dental Clinic.  Each of the warrants involved in this action was made payable to one or the other of the defendants; none was jointly payable.  The Court finds that each defendant endorsed the warrants payable to him and received the proceeds.  Defendant Talbott testified that some of the warrant proceeds were placed by each doctor into a joint account to cover overhead for the clinic.  The remainder of the warrant proceeds were retained by the individual defendant who received the warrant.

## II

In general terms, the indictment in this case charges that the defendants, through the use of the mails, billed and received payment for dental examinations, services or treatments which were "either medically unnecessary or, if necessary, performed in such an unprofessional manner, with utter disregard for the patient's well-being, as to be harmful and detrimental to continued good health."  The evidence adduced in this case relates primarily to two specific treatments, root canal therapy and restorations or fillings.  A brief description of these treatments is required in order to evaluate the actions of the defendants.

### Root Canal Therapy

Root canal therapy is generally performed in an attempt to save a tooth in which an unsatisfactory condition of the dental pulp exists.  The dental pulp consists of living tissue (mostly nerves and blood vessels) which is located in the central portion of the tooth surrounded by the dentin and enamel.  The pulp extends from the pulp chamber in the center of the crown of the tooth (the visible portion of the tooth exposed to the oral cavity), along the root or roots of the tooth (the portion of the

tooth which fixes its position in the jaw bone), to the apex or tip of the root where it emerges from the tooth.  An unsatisfactory pulp condition may be caused by infection in the body which renders the pulp necrotic or dead, or by exposure resulting from serious decay or trauma.

An unsatisfactory pulp condition is diagnosed through clinical examination, patient symptoms, radiographs (X-rays), and professional judgment and experience.  The clinical examination usually includes visual observation, palpation, percussion and perhaps thermal pulp testing.  Important patient symptoms include pain and swelling.  Radiographs or X-rays are important diagnostic tools when root canal therapy is considered.

The evidence in this case includes three types of radiographs.  A "bitewing" radiograph generally depicts the crown portion of the tooth; several teeth in both the mandibular and maxillary jaws are shown in each X-ray.  Bitewing radiographs are most commonly used to diagnose caries or cavities caused by decay on the interproximal surfaces of the teeth and to determine the crestal level of the jaw bone.  The second type of X-ray is called a periapical radiograph.  This type of X-ray depicts the entire tooth (crown and root) and usually includes several teeth in a single jaw.  Periapical radiographs are generally used to diagnose periodontal disease and detect periapical lesions which normally indicate diseased or necrotic pulp tissue.  The third type of X-ray is panograph.  This X-ray depicts all of the teeth in both jaws in panoramic fashion.  It is used to reflect the general oral hygiene of the patient.  Of these types of X-rays, the periapical radiograph is the most useful in diagnosing the conditions which render root canal therapy as proper treatment.  Periapical lesions appear on these radiographs as a radioluscent or non-opaque area around the apex of the root.  These lesions signify bone loss or potential bone loss surrounding the root and are indicative of an unsatisfactory pulp condition.  Bitewing radiographs are generally considered to be an inadequate tool to de-

termine that root canal therapy is appropriate since these X-rays do not depict the root portion of the teeth.

The final diagnostic tool used to indicate root canal therapy is the judgment and experience of the dentist. The results of the diagnostic tests must be evaluated in light of the dentist's training and experience and the general condition of the patient's dentition. A decision concerning root canal therapy is then normally made after consultation with the patient.

Root canal therapy, generally speaking, consists of three steps. The first step is debridement or mechanical cleansing of the canal. In this step the pulp tissue is removed from the pulp chamber and the root canal. When there is no vital pulp in the tooth, the authorities in the dental profession are generally agreed that the root canals should be cleansed to the best extent possible. If there is still some vital tissue in the tooth, the authorities agree that the root canal should be cleansed to a point within a few millimeters of the apex, but perhaps not to the furthest extent possible. This point of debridement, sometimes referred to as the physiological apex, falls within the last one-third of the root canal short of the anatomical apex. Following the removal of the pulp tissue, the root canal is reamed and shaped to accept a filling material.

The second step in root canal therapy is chemical disinfection. In this step the crown and root canal where the pulp has been removed are irrigated or various chemicals are placed in the tooth. Regardless of technique, the purpose of this step is to rid the interior of the tooth of bacteria.

The final step in the root canal procedure is the obturation or filling of the void space in the tooth. The purpose of obturation is to provide a seal between the periapical tissue at the apex of the root and the oral cavity. Obturation is generally accomplished by one of three methods.

One method is the so-called silver point method. In this method a silver wire is inserted into the root canal and cemented in place using an inert cement. The second method is referred to as gutta percha. This method also consists of the placement of an inert substance into the pulp chamber and root canal.

The third method is the Sargenti technique. This methods differs from silver point and gutta percha in that the filling substance, usually called Sargenti paste, contains an active ingredient. This active ingredient, paraformaldehyde, is a bactericidal agent. Sargenti paste, in its most common formulation, also contains zinc oxide as an inert filler and bismuth as radiopaque material. Each of these ingredients is in powder form which is mixed with a liquid, eugenol, to achieve a paste-like consistency. Following insertion into the tooth, this paste becomes semi-hard. As with the other methods, complete obturation is the goal. However, the void should not be overfilled with Sargenti paste since it is not desirable to force the paraformaldehyde beyond the apex of the tooth into the surrounding tissue. Thus, slight underfilling is preferred to overfilling. It is also thought that satisfactory results can be obtained with slight underfilling since the paste contains an active ingredient to fight infection.

Regardless of the method of obturation, the filling substance must be capped with a restoration or crown to protect it and seal it from the oral cavity. Although a very simple root canal therapy may be performed in a single appointment, the procedure is generally accomplished in two or three appointments.

Teeth have one, two or three roots and each root may have more than one canal. Some canals can be easily negotiated while others may be so shaped as to prevent complete debridement of the canal. Most canals, however, can be negotiated to within a few millimeters of the apex. Once root canal therapy is begun and the pulp is exposed, the dental authorities agree that all of the root canals in the tooth should be included in the treatment.

Root canal therapy is a distinct endodontic treatment from a pulpotomy. A pulpo-

tomy consists of debridement, chemical disinfection and obturation of the coronal or crown portion of the pulp chamber without extension into the root canals. This procedure is most commonly used on diciduous teeth rather than adult teeth. Although it may be used as an interim or final treatment on an adult tooth, the potential risk of re-infection to exposed pulp renders pulpotomies on adult teeth generally unacceptable. Adult teeth in need of endodontic treatment are therefore usually given root canal therapy or a pulp capping procedure in which the pulp is not exposed or is exposed only minutely.

Compared to a root canal procedure, a pulpotomy is a relatively swift and easy procedure, since the root canals need not be negotiated. The Ohio Medical Assistance Program reimburses for pulpotomies at the rate of $10.00 per tooth. The reimbursement rate for root canal therapy depends on the number of canals; one canal—$55.00, two canals—$65.00, and three canals—$85.00. Prior to November 15, 1976, prior authorization was not required to receive reimbursement for root canal therapy. During that period root canal therapy was the most expensive treatment for which prior authorization was not required.

*Restorations*

The second procedure involved in this case is the placement of restorations on anterior teeth. Although there are a number of restorative procedures, the procedure discussed here is that which is commonly called a filling. Fillings are ordinarily placed in teeth in order to restore the integrity of the tooth following the removal of dental decay.

Dental decay is the result of a bacterial process in which carbohydrates and sugars are fermented. The bacterial process produces an acid which causes the decalcification of the tooth. Since this bacterial process takes a period of time to cause dental decay, it is found most often in places where bacteria and debris containing carbohydrates and sugars lodge and are not easily dislodged by brushing or by the natural cleansing of the teeth. In other words, dental decay is most common in the interproximal areas (the area between teeth) and the biting surfaces of posterior teeth which are irregular.

The surfaces of the anterior teeth are generally smooth and are, therefore, more or less self-cleansing through the normal function of the lips, tongue and eating. The smooth surfaces of the anterior teeth are usually the last areas to be afflicted by dental decay. If there is a gross neglect of oral hygiene and rampant caries or cavities exist, the anterior teeth will also likely be affected. In this case, however, the dental decay would be most likely to exist at the cervical portion of the tooth where debris would gather close to the soft tissue of the gum.

When decay is found on the smooth surface of the anterior teeth in the coronal region but not in the cervical region, it is generally because there was a pre-existing hypoplastic defect. A hypoplastic defect is a pit or fissure which provides a sanctuary for bacteria and debris. Such defects occur when something (such as illness) interferes with the normal formation of the tooth. Since hypoplastic defects develop in the formation process of the teeth, these defects are normally found in a rainbow pattern reflecting the pattern in which the teeth are formed. That is, the mid-coronal portion of the incisors and the tips of the cuspids would be involved. If hypoplastic defects are discovered before dental decay has occurred, these defects may be removed through a procedure known as a prophylactic odontonomy. In this procedure the tooth surface is reformed to remove the pit or fissure, but no filling is inserted.

The type of filling material used in restorations may vary according to the extent of the cavity and the location of the tooth. The Ohio Medical Assistance Program provides reimbursement for amalgam or composite restorations without prior authorization at the rate of $5.00 for one surface, $8.00 for two surfaces, and $10.00 for three surfaces. Silicate, acrylic or plastic restorations (normally used in anterior teeth) are

reimbursed without prior authorization at the rate of $8.00 for each filling, regardless of which surface is treated.

### III

▮ The Court will first discuss Counts II through XIV of the indictment which allege mail fraud in violation of 18 U.S.C. § 1341. In order to establish the offense charged in Counts II through XIV, each of the following essential elements must be proved beyond a reasonable doubt:

*First* :

> That the defendants knowingly and willfully devised and intended to devise a scheme or artifice to defraud the United States and the State of Ohio and to obtain money from the Ohio Department of Public Welfare by means of false and fraudulent pretenses, representations and promises;

*Second* :

> That the defendants, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, knowingly caused to be delivered by mail, according to the direction thereon a letter containing a check from the Ohio Department of Public Welfare addressed to one of the defendants;

*Third* :

> That the acts occurred in the Southern District of Ohio, Eastern Division, on or about the dates set forth in the indictment.

*Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954). The indictment also charges the defendants under 18 U.S.C. § 2 as aiders and abettors of each other's unlawful acts. In order to establish the guilt of a defendant as an aider and abettor, the government must prove that the defendant had the "specific intent to facilitate the commission of a crime by another." *United States v. Prince*, 529 F.2d 1108, 1112 (6th Cir. 1976). Thus, presence at the scene of a crime coupled with knowledge that a crime is being committed does not constitute aiding and abetting unless the defendant associated himself with the criminal venture as something that he wished to bring about.

Although Counts II through XIV of the indictment involve an alleged common scheme or artifice to defraud and obtain money, each Count, and the evidence which relates to it, must be examined separately. The Court will, therefore, set forth its specific findings with respect to each patient involved in Counts II through XIV and then its general findings applicable to all of these Counts.

### Brian Dailey (Count II)

Count II of the indictment relates to a check dated October 7, 1976, addressed to defendant Taylor. This check included payment for seven root canal therapies and four restorations alleged to have been performed on Brian Dailey by defendant Taylor on August 27, 1976, and September 2, 1976. The teeth billed for root canal therapy were numbers 3, 7, 8, 9, 10, 14 and 30. (A chart showing the location of each tooth in the oral cavity is attached hereto as Appendix A.)

The treatment on tooth number 3 most closely resembles a pulpotomy. Although there has been endodontic treatment of some sort, the entire pulp chamber was not filled since a substantial void appears on the post-operative radiographs. There is evidence of some radiopaque material in one of the root canals on tooth number 3, but there is no indication of any attempt to obturate the remaining canals on this tooth.

From the radiographs taken at the South Side Dental Clinic it appears that a root canal therapy was performed on tooth number 7. This treatment, did not, however, completely obturate the root canal since a distinct radioluscency is visible in the canal on either side of the filling material. The crown portion of tooth number 7 had a substantial amount of dental decay. On radiographs taken by Dr. McDaniel in August 1977 it appears that the restoration placed over the root canal therapy failed

due to the condition of the crown. On the August 1977 radiograph, tooth number 7 is badly broken down and much of the root canal filling has been lost.

Root canal therapy was adequately performed on tooth number 8, although serious dental decay in the crown portion of this tooth was not properly treated. Tooth number 9 has clearly had endodontic treatment. However, the obturation of the canal was not complete since a void can be observed through the entire length of the canal. Again serious decay in the crown was inadequately treated.

The treatment performed on tooth number 10 falls far short of professionally acceptable root canal therapy. The pulp chamber has been filled, but the filling only extends approximately one-half the length of the root with substantial void areas evident.

The treatment afforded tooth number 14 appears to be a pulpotomy with extension of the filling material into one of the roots. The other two roots do not appear to have been entered.

Although defendant Taylor billed for endodontic treatment to tooth number 30, he testified that the treatment was actually rendered to tooth number 19 and erroneously billed as tooth number 30. Tooth 30 appears to be badly broken down, without any sign of treatment. Tooth 19 does appear to have been treated, and the Court believes that it was this treatment which resulted in the billing for tooth 30. The treatment to tooth 19 does not, however, appear to be professionally acceptable root canal therapy. No filling substance can be observed in one of the roots, and substantial voids were left in the pulp chamber.

### Ernestine Hall (Count III)

Defendant Taylor submitted an invoice for root canal therapy on teeth 2, 3 and 15 performed on September 17, 1976. The records of the South Side Dental Clinic show, however, that defendant Talbott provided the treatment on this patient on that date. Taylor received a warrant in payment for these services dated November 5, 1976.

The treatment rendered to each of these teeth appears to be only a pulpotomy with little or no obturation of the root canals.

### Kimberly Wodzisz (Count IV)

Defendant Taylor submitted an invoice dated November 13, 1976, which included root canal therapy for teeth number 2, 3, 5 and 6 performed September 22, 1976. Taylor received payment by a warrant dated January 6, 1977. The defendants' records show that defendant Talbott performed root canal therapy on teeth 3, 5, 14 and 15 on September 22, 1976. No endodontic treatment was afforded to teeth 2 and 6. Endodontic treatment was rendered to tooth 3; however, one root was not filled. The root canal on tooth number 5 has been filled approximately half its distance. A reasonable attempt at root canal therapy appears to have been carried out on teeth 14 and 15.

### Priscilla Lipsey (Count V)

The records of the South Side Dental Clinic reflect root canal therapy being performed on teeth 4 and 5 on August 10, 1976, and on teeth 2 and 3 on October 14, 1976, by defendant Taylor. Invoices were submitted for these treatments, and a warrant payable to Taylor was issued January 1, 1977. Teeth number 2 and 3 are three-rooted teeth. The post-operative radiographs of the South Side Dental Clinic show some filling substance in the pulp chamber but no filling material in at least two of the three roots on each of these teeth. The post-operative X-rays for teeth 4 and 5 show that root canal therapy was performed on tooth 4. There is also evidence of root canal therapy on tooth 5, but the obturation of the root extends only about one-half its length. In X-rays taken in the fall of 1977, no filling substance can be seen in tooth 4. It appears to the Court that the restoration placed in the crown of tooth number 4 fell out allowing the root canal filling to also fall out. At some later time a restoration was apparently replaced in tooth number 4 without refilling the root canal.

## Vickie Fitzwater (Count VI)

Vickie Fitzwater was treated on several occasions between May 3, 1976, and May 15, 1976. Defendant Talbott billed and received payment for 15 root canal therapies during this period. The Court finds that root canal therapy was performed or attempted on teeth numbers 2, 3, 7, 8, 9, 15, 20, 28 and 29. The treatment rendered to teeth 5, 10, 13, 14, 19 and 30 is inadequate for failure to obturate the root canal systems.

Talbott also billed for a three-quarter gingivectomy at a cost of $135.00. A gingivectomy is the surgical removal of gum tissue surrounding the cervical portion of the tooth. Such treatment is ill-advised for pregnant women. Vickie Fitzwater, who was pregnant at the time of the alleged gingivectomy, testified that she recalled no bleeding or soreness of her mouth or gums following treatment. The Court does not believe that a gingivectomy was performed on this patient.

## Joseph Taynor (Count VII)

Defendant Talbott submitted an invoice dated July 6, 1976, which sought reimbursement for four root canal therapies, teeth 2, 29, 30 and 31. The evidence before the Court is insufficient to draw any conclusion concerning the treatment, if any, rendered to tooth number 2. There is no evidence of root canal therapy having been performed on tooth 29; however, an amalgam restoration was placed in the tooth. Tooth number 30 appears to be missing in all of the radiographs before the Court, including those taken at the South Side Dental Clinic at the time of treatment. There is a filling substance in the pulp chamber of tooth 31 and in one root canal. The other root canal is void.

## Nellie Taynor (Count VIII)

Count VIII of the indictment relates to five root canal therapies allegedly performed by defendant Taylor on Nellie Taynor during her first appointment at the South Side Dental Clinic on July 6, 1976. An invoice for these services was submitted by defendant Talbott, and he received payment by a warrant dated July 30, 1976. The teeth billed for root canal therapy were numbers 3, 4, 7, 28 and 29. Generally speaking, the teeth remaining in Nellie Taynor's mouth were beyond repair. The expert witnesses called by the government who testified at trial agreed that the proper treatment for Nellie Taynor would have been the extraction of her remaining teeth. Although tooth number 3 had dental decay extending beyond the alveolar bone and almost into the trifurcation of the roots and was essentially non-restorable, defendant Taylor attempted endodontic treatment on this tooth. This treatment resembles a pulpotomy with no evidence of filling substance in the root canals.

The root canal therapy rendered to tooth 4 was inadequate since obturation was accomplished only half the length of the root. Although it may not have been appropriate treatment on this patient, the Court finds that root canal therapy was performed on teeth 7, 28 and 29.

Count VIII also relates to five root canal therapies allegedly performed on July 12, 1976, and one root canal therapy on July 19, 1976. Although the treatment on these dates was rendered by defendant Taylor, defendant Talbott submitted the invoices and received payment for these services. Root canal therapy was rendered to teeth 11, 12 and 13. No root canal therapy was performed on tooth 20. There is some evidence of endodontic treatment to tooth 21, but there is no filling substance in the pulp chamber or the apical third of the root canal.

The endodontic treatment rendered on July 19, 1976, to tooth 15 failed to obturate one of the root canals. However, the extent of dental decay in this tooth was so severe that attempted restoration was useless and it should have been extracted.

## Larry Hall (Count IX)

On August 3, 1976, defendant Talbott submitted an invoice for three root canal treatments (teeth 3, 7 and 14) on Larry

Hall. The services for which this invoice was submitted were performed on August 5, 1976, by defendant Taylor.

While it appears that some endodontic treatment was rendered to tooth 3, it does not appear that the root canals were filled to within one-third of the apex of the root. The obturation of the root canal of tooth number 7 extends for approximately three-quarters of its length but only about one-half of its width. The treatment given on tooth 14 resembled a pulpotomy. None of the treatment rendered to these three teeth constituted professionally acceptable root canal therapy.

## Michelle Russell (Count X)

Defendant Talbott submitted an invoice and received payment for five root canal treatments (teeth 3, 14, 19, 30 and 31) allegedly performed on November 11, 1976. The treatment actually rendered to teeth 3 and 14 resemble pulpotomies. Although there is slight extension of filling substance into the root canal of tooth 19, the treatment is little more than a pulpotomy. At least one canal in both teeth 30 and 31 was not obturated in the treatment rendered by defendant Talbott.

## Alan Dailey (Count XI)

Count XI relates to eight root canals allegedly performed on Alan Dailey by defendant Talbott. Talbott received payment for these services by a warrant dated January 6, 1977. Of the eight teeth billed for root canal therapy (teeth 2, 7, 10, 12, 14, 15, 30 and 31), only one, tooth number 12, appears to have received root canal treatment. The treatment rendered to all of the remaining teeth appears to be, at best, pulpotomies with perhaps some obturation of one root canal on multi-rooted teeth (teeth 15, 30 and 31).

## Atwinna Howard (Count XII)

Root canal therapy was allegedly performed on four of Atwinna Howard's teeth on October 5, 1976, by defendant Talbott. The teeth involved in Count XII are teeth 3, 14, 30 and 31. There is some indication of endodontic treatment on tooth number 3. It does not appear, however, that even the pulp chamber in the coronal portion of the tooth was filled, and there is no evidence of obturation in the root canals.

The treatment rendered to tooth 14 resembles a pulpotomy. Tooth number 30 appears to have one root canal partially filled, but one root canal appears void. Root canal therapy was performed on tooth number 31.

## Jacklin Moore Herald (Count XIII)

On January 13, 1977, Jacklin Herald went to the South Side Dental Clinic. Although the patient folder from the clinic reflects that Herald had a second appointment on Saturday, January 15, 1977, the Court finds from the testimony of Herald and the defendants' appointment book that she had only one appointment. On that occasion 29 restorations were placed in her mouth. Twenty-three of these restorations were placed in the 12 anterior teeth. Except for one filling placed on the mesial surface of tooth 9, all of the restorations were placed in the lingual surface. These restorations averaged one millimeter in diameter and followed a general pattern of two per tooth.

When Herald was examined by Dr. Kramer on January 26, 1977, her mouth did not show signs of extensive interproximal caries which would be indicative of a rampant caries mouth. Nor did the restorations follow the pattern which might result from hypoplastic defects during the formation of the teeth. Some of these restorations were deep restorations which led Herald to complain of toothaches when several of the restorations fell out.

Upon the evidence before it, the Court can find no plausible explanation for the number and pattern of restorations rendered to this patient.

## Dorothy Vincent (Count XIV)

On January 10, 1977, Dorothy Vincent received 32 restorations placed in her teeth at the South Side Dental Clinic. Count XIV of the indictment includes a payment

for 12 restorations placed in the six anterior teeth of the mandibular jaw (teeth 22 through 27) pursuant to an invoice dated January 10, 1977, and signed by defendant Talbott.

This patient was examined by Dr. Kramer at Children's Hospital on January 26, 1977. Although Dorothy Vincent had serious dental decay, especially in the interproximal areas of the maxillary teeth, Dr. Kramer could find no medical basis for the restorations placed in the mandibular incisors. Even though some carious lesions were present in the interproximal areas of these teeth, the restorations had been placed on the lingual surface. Dr. Kramer further testified that the pattern of restorations observed on the teeth of Dorothy Vincent was identical to the pattern observed on the teeth of Jacklin Herald.

## IV

■ In addition to the evidence adduced concerning the specific teeth discussed hereinabove, the Court also received evidence concerning other treatment rendered to the patients which are the subjects of Counts II through XIV of the indictment. Further, the Court heard statistical evidence concerning the total number of billings for root canal therapy submitted by the defendants and paid by the Department of Public Welfare. The Court believes such evidence to be admissible to show the existence of a scheme or artifice to defraud.

■ In making its factual findings in this case, the Court has relied heavily upon the expert testimony adduced at trial. The Court specifically finds Doctors Blozis, Hiatt and Kramer to be highly credible witnesses. These witnesses agreed that the quality of treatment rendered by the defendants at the South Side Dental Clinic was below the minimum standards of the dental profession. Dr. Alexander Armstrong, called by the defendants as an expert in endodontics, also opined that the quality of endodontic treatment rendered by the defendants was poorer than any standard which he had encountered. Professional incompetency or malpractice is

not, however, a criminal offense. Proof that these defendants are poor dentists does not therefore meet the government's burden in this case.

■ Upon consideration of all the evidence, the Court finds that the government has met its burden of proof to show that the defendants knowingly and willfully devised and intended to devise a scheme or artifice to defraud. The record is replete with examples of (1) endodontic treatment being performed without proper diagnostic X-rays; (2) endodontic treatment on teeth which were not indicated for endodontic treatment; (3) endodontic treatment which was billed as root canal therapy, but which could be described by the experts as a pulpotomy at best; and (4) the placement of unnecessary restorations on teeth while obvious caries were left untreated.

The Court heard considerable evidence concerning the relative merits of the three methods of root canal therapy. The fact that these defendants employed the Sargenti technique does not explain the treatment rendered by them. Although Sargenti paste may not appear on radiographs with the extent of radiopacity characteristic of silver paint and gutta percha, the experts agreed and the evidence shows that Sargenti paste contains radiopaque materials which are visible on post-operative X-rays. The radiopacity of endodontic filling material is fundamental to the profession. Further, obturation of at least two-thirds the length of the root canal is required regardless of the technique employed. The radiographic evidence clearly shows, however, that the root canals of many teeth were not entered and that others were filled so inadequately as to render the treatment useless. Although Sargenti paste may be susceptible to resorption into the body through the apex of the roots of the tooth, the lack of root canal treatment was readily observable on the radiographs taken at the South Side Dental Clinic following treatment as well as the radiographs taken by Dr. McDaniel in November 1977. Based upon the training and experience of the defendants, together with the availability of post-operative radi-

ographs, the Court finds it reasonable to infer that these defendants knew that they were not performing root canal therapy.

The endodontic treatments actually rendered by defendants required a relatively short time to perform since the time consuming process of debriding, disinfecting and obturating the root canals was omitted. Defendant Taylor billed for 40 root canal therapies on September 9, 1976, and defendant Talbott billed for 67 root canal therapies on November 10, 1976. Defendant Taylor submitted invoices for 424 root canal therapies for the month of September 1976, 158 for October 1976, and 55 for the first 13 days of November 1976. Defendant Talbott billed for 83 root canal therapies in September 1976, 260 for October 1976 and 382 for the first 13 days of November 1976. Effective November 15, 1976, prior authorization was required to receive reimbursement for root canal therapy. Despite the number of root canal therapies deemed necessary by the defendants prior to November 15, 1976, only 17 requests for prior authorization for root canal therapy were submitted between November 15, 1976, and August 1977.

The defendants' actions appear beyond reasonable doubt to be part of a concerted effort to maximize their reimbursement from the Department of Public Welfare. All of the endodontic treatment was invoiced as root canal therapy even though it was actually a pulpotomy for which the Medical Assistance Program pays only $10.00. Moreover, endodontic treatment was rendered to badly broken down teeth which were either non-restorable or which required extensive treatment beyond that available to Medicaid recipients to be restored. Such teeth should have been extracted. The rate of reimbursement for extractions, however, is only $6.00 for the first tooth and $4.00 for each additional tooth extracted at the same appointment. In some instances the defendants received payments of $55.00, $65.00 or $80.00 for root canal therapy and thereafter also received payment for extractions when the endodontic treatment failed. Perhaps most disturbing is the endodontic treatment rendered to healthy teeth.

The Court is well aware that the practice of dentistry is not a precise profession. Specifically, root canal therapy is often difficult, and the theoretic goal of the treatment cannot always be obtained. Thus, if this case involved only a few teeth which did not appear to be adequately treated, or treated in spite of contrary indications, the Court would be reluctant to find that a scheme or artifice to defraud existed. This case does not, however, involve a relatively few teeth. It involves dozens of teeth and repeated examples of grossly inadequate treatment. Such treatment cannot be attributed to inadvertence, or even negligence, by persons trained and licensed to practice dentistry. The Court finds, therefore, that the defendants acted knowingly, willfully and with the intent to defraud or obtain money by false pretenses.

The Court also finds that the defendants devised or intended to devise a scheme or artifice to defraud with respect to the pattern of small restorations placed in patients' anterior teeth. Although the patients treated by these defendants demonstrated below average oral hygiene, none of the expert witnesses could account for this pattern of restorations.

The lingual surface of the anterior teeth is a relatively easy portion of the dentition for a dentist to treat. Thus numerous fillings could be quickly placed in these tooth surfaces with little difficulty. The interproximal areas of the dentition, where decay is more likely present, are more difficult and time-consuming to restore. Hence, many interproximal caries were left untreated. The reimbursement rate for restorations is the same regardless of the location or difficulty of its placement.

The pattern of restorations is not limited to Herald and Vincent. A similar pattern is apparent with respect to Brian Dailey, Ernestine Hall, Wodzisz, Lipsey, Fitzwater, Larry Hall, Russell and Alan Dailey. With the exception of Larry Hall and Fitzwater, the majority of these restorations were placed following November 15, 1976, when

the defendants could no longer bill for root canal therapy without prior authorization.

■ The Court finds that the use of the mails was an integral part of the defendants' scheme and artifice to defraud. The fraudulent invoices were mailed to the Department of Public Welfare for processing, and the warrants were mailed to the defendants. In *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) the Court held that the fraudulent misapplication of the funds of a school district did not constitute a violation of 18 U.S.C. § 1341 despite the fact that the funds were obtained through tax assessments mailed to property owners and payments also sent by mail. In holding that these mailings were not shown to have been known for the purpose of executing the fraudulent scheme, the Court emphasized that the taxes assessed were not excessive or illegal, and their collection was required by state law. In the instant case the invoices were fraudulent and solicited payment to which the defendants were not entitled. Thus the warrants caused to be mailed by the defendants represented funds obtained by false pretenses. Unlike *Parr* the question in this case is how the funds were obtained, rather than the application of funds otherwise legally obtained. The Court also finds the mailing of the warrants to be an integral part of the scheme and essential to its consummation. Unlike *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944) the scheme in the instant case did not reach fruition until the warrants were received by the defendants.

The Court concludes therefore that the defendant who submitted the invoice for services knowingly caused a warrant to be mailed to him for the purpose of executing the scheme and artifice to defraud.

The Court further finds that the acts alleged in the indictment occurred within the Eastern Division of the Southern District of Ohio on or about the dates set forth in the indictment.

■ The Court does not find that the government has met its burden of proof to show that the defendants aided and abetted one another pursuant to 18 U.S.C. § 2(a) with respect to counts II, V, VI, VII, X, XI, XII, XIII and XIV. In order to establish aiding and abetting, the government must prove beyond a reasonable doubt that the defendant knowingly participated in the criminal act with the specific intent to facilitate the commission of a crime. Looking at the specific acts charged in each of Counts II through XIV, and considering each count separately, this burden of proof has been met with respect to Counts III, IV, VIII and IX. With respect to Counts III and IV the evidence shows that defendant Talbott rendered the services, but that defendant Taylor submitted the invoices and received payment. As to Counts VIII and IX defendant Taylor rendered the services, but defendant Talbott submitted the invoices and received payment.

Although the evidence shows that some payments were placed in a joint account to cover operating expenses, there is no basis from which the Court can infer that any of the warrants involved in Counts II through XIV were so deposited. Nor is there any evidence from which the Court could conclude beyond a reasonable doubt that one defendant who did not treat a particular patient knew of the fraudulent nature of the specific invoices submitted by the other at the time of their submission. Although *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) would appear to permit a conviction of a co-conspirator for substantive offenses committed in the course of a conspiracy without direct participation in the substantive offense, I do not believe that it compels conviction as aiders and abetters as charged in this case. *Cf.*, Proposed New Federal Criminal Code, 18 U.S.C. § 401; *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949).

For the foregoing reasons the Court finds defendant Taylor Guilty with respect to Counts II, III, IV, V, VIII and IX and Not Guilty with respect to Counts VI, VII, X, XI, XII, XIII and XIV as charged in the indictment. The Court finds defendant Talbott Guilty as to Counts III, IV, VI, VII,

VIII, IX, X, XI, XII, XIII and XIV and Not Guilty as to Counts II and V as charged in the indictment.

## V

Count I of the indictment charges the defendants with conspiring to commit an offense against the United States in violation of 18 U.S.C. § 371. In order to establish the offense of conspiracy, the government must prove each of the following essential elements beyond a reasonable doubt:

*First* :

That the defendants willfully and knowingly combined, conspired, confederated, and agreed to willfully and knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises through the use of the mails;

*Second* :

That the object of the conspiracy or agreement constituted an offense against the United States in violation of 18 U.S.C. § 1341;

*Third* :

That the defendant entertained the specific intent to work in concert with one another when they knew or should have known that the specific object of the conspiracy or agreement was unlawful;

*Fourth* :

That one or both of the defendants committed at least one of the overt acts alleged in the indictment in furtherance of some object or purpose of the conspiracy;

*Fifth* :

That the conspiracy or agreement occurred in the Eastern Division of the Southern District of Ohio on or about the period of April 4, 1976, through June 24, 1977.

■ The Court finds that the government has met its burden of proof with respect to both defendants concerning Count I of the indictment. The Court is convinced beyond a reasonable doubt that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan; that is, that they agreed to disobey or disregard the law in order to improve their financial position.

The defendants acted together in establishing the South Side Dental Clinic and its course of operation. The evidence shows that these defendants expressly agreed to attempt to establish a practice oriented towards those receiving public assistance. To that end the defendants jointly solicited patients through the use of business cards distributed at the food stamp centers and placed a sign reading "Health Cards Welcome" in the window of the clinic. The type and pattern of treatment rendered by each defendant are nearly identical, as is the quality of such treatments. Both of the defendants treated many of the same patients, sometimes on the same day. Both defendants submitted invoices and received payments for work performed by the other. Finally, some of the proceeds of this venture were co-mingled in order to pay operating expenses. Thus, the Court finds beyond a reasonable doubt that the defendants knowingly and willfully agreed to act in concert to disobey or disregard the law by obtaining money under false and fraudulent pretenses.

In accordance with the discussion of Counts II through XIV hereinabove, the Court finds that the object of the conspiracy constituted an offense against the United States pursuant to 18 U.S.C. § 1341.

■ The Court finds beyond a reasonable doubt that both defendants entertained the specific intent to work in concert with one another when they knew or should have known that the object of their agreement was unlawful. Although the Court has found insufficient evidence to establish that the defendants aided and abetted one an-

other in the commission of specific offenses, such a finding is not inconsistent with the existence of a conspiracy with both of the defendants as knowing and willful participants. Conspiracy and aiding and abetting are distinct offenses. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). *United States v. Townes*, 512 F.2d 1057 (6th Cir. 1975).

The Court's findings of fact set forth above, together with its verdicts as to Counts II through XIV of the indictment clearly establish that one or more of the overt acts set forth in the indictment were committed by the defendants in furtherance of some object or purpose of the conspiracy. It is also established beyond a reasonable doubt that these acts occurred in the Eastern Division of the Southern District of Ohio during the period alleged in the indictment.

Verdicts of Guilty with respect to Count I of the indictment are therefore entered as to both defendants.

This matter is hereby referred to the Probation Department for the preparation of presentence reports.

It is so ORDERED.

APPENDIX A

Maxillary (Upper) Jaw