ON APPLICATION FOR REHEARING
PER CURIAM.
On application for rehearing, the opinion of this Court dated May 25, 1990, is withdrawn and the following is substituted therefor.
The plaintiffs, Marianne Dorton and her husband, Raymond Clyde Dorton, appeal from the denial of a new trial following a jury verdict in favor of the defendants, Landmark Dental Care of Tuscaloosa, P.C. (“Landmark”), and Dr. Harold K. Emmons, in an action alleging negligence and wantoness on the part of the defendants in the dental treatment of Mrs. Dorton.[1] The only issue is whether the verdict was against the great weight of the evidence so as to be palpably wrong and manifestly unjust, and therefore to require reversal of the trial court’s denial of the Dortons’ motion for new trial.
The essence of the Dortons’ claims is that Dr. Emmons used a highly toxic material, known as Sargenti paste, or N-2,[2] to fill a root canal he performed on Mrs. Dor-ton’s tooth, that an extrusion of that paste beyond the apex of her tooth into her mandible proximately caused her pain and suffering, and that she was required to undergo surgery for removal of the extruded paste. The parties joined issue on whether the use of Sargenti paste in general or Dr. Emmons’s treatment of Mrs. Dorton in particular violated the standard of care required of dentists performing root canals and, if so, whether that violation proximately caused the Dortons’ alleged injuries.
On Thursday, August 22, 1985, Mrs. Dor-ton went to Landmark Dental Care for treatment of a toothache. Dr. Emmons, a general dentist, conducted an examination and found one of Mrs. Dorton’s lower right molars to be sensitive to percussion. X-rays revealed that the tooth harbored a large cavity, which had previously been filled, and that it was abscessed, with decay to the nerve. Dr. Emmons testified that he told Mrs. Dorton that he could either extract the tooth or perform a root canal and possibly save the tooth. Mrs. Dorton testified that he told her only of the root canal as an option. In either case, Dr. Emmons began the root canal on that visit.[3]
*427 After debriding the tooth, Dr. Emmons placed a cotton pellet with formo-cresol in the tooth and then put a temporary filling in the tooth. He gave Mrs. Dorton prescriptions for an antibiotic and a pain medication and set an appointment for her to have the canal filled a week later. Mrs. Dorton testified that she was nauseous and feverish that night and that a piece of the tooth broke off. She said that she returned to Landmark the next day to ask about the broken tooth, but that Dr. Em-mons gave her no explanation, merely offering to crown the tooth for an additional charge. In her deposition, she stated that she complained of numbness at that visit. Dr. Emmons denied that she came in to the office on Friday, August 23, and said he did not remember or have a record of her complaining of numbness until later or of a broken tooth at any time.
Mrs. Dorton testified that she continued to be nauseous and feverish over the weekend, and that she returned to Landmark on Monday, August 26. She testified that she could not wait the full week to go back, but that Dr. Emmons gave her no explanation for the nausea and fever. He completed the root canal on that visit, filing the canal further and inserting the Sargenti paste. The first insertion of paste did not fill the canal, so he inserted an additional amount. The X-ray taken after the second insertion showed the extruded paste within her mandible. The right inferior alveolar nerve, which supplies sensation to the right side of the jaw, the chin, and the lower lip, runs through the mandible, and the Sargenti paste was in close proximity to it; Dr. Emmons testified that he “[did] not feel the excess was in close enough proximity” to the nerve to cause any problems. Mrs. Dorton testified that Dr. Emmons did not tell her of the extrusion, but he testified that he told her that “there was some excess but that I did not feel it was going to [be] any problem.” He did not tell her that the extrusion consisted of Sargenti paste or mention its toxic properties.
The next morning, August 27, Mrs. Dor-ton returned to Dr. Emmons’s office, complaining of pain and numbness in the areas of her lip and chin. Dr. Emmons told Mrs. Dorton that the numbness she was experiencing was probably caused by an inadvertent “nicking” of the nerve tissue when he had given her a shot of anesthetic, and that there was no reason for concern. Mrs. Dorton testified that “over the next two days the pain [worsened]. I couldn’t even keep water down. I would drink water, and it would come back up on me, where I was so nauseated. I had a fever and sweating and the chills and the numbness in my face. [Dr. Emmons] said in a day or two it would be getting better, and it didn’t. It not only was numb here, it started travelling this way and coming up into my cheek.”
Mrs. Dorton further testified that she went back to see Dr. Emmons on August 29, and that he again told her that there was no cause for concern and that she should simply double-up on her pain killers. Dr. Emmons testified that he did not remember or have a record of seeing her that day or at any other time after August 27. The next morning, August 30, Mrs. Dorton telephoned Dr. Emmons to tell him that she was low on pain medication. Dr. Emmons telephoned the pharmacy and authorized another prescription for pain medication.
On Saturday, August 31, Mrs. Dorton returned to Landmark’s office, seeking relief from her pain. Because Dr. Emmons *428 was not in the office, Mrs. Dorton was seen by Dr. Cashion, another of Landmark’s dentists. After taking X-rays of Mrs. Dor-ton’s mouth, Dr. Cashion told her that he was not going to touch the work that Dr. Emmons had done.
On Tuesday, September 3,[4] Mrs. Dorton went to Dr. Ronald Mcllwain, a dentist who specializes in oral surgery. Dr. Mcllwain, on direct examination, testified that Mrs. Dorton came to him with complaints of severe pain of the right jaw and numbness of the right lower lip; that she told him that, following her treatment by Dr. Em-mons, she had experienced continued pain and the onset of numbness; that he telephoned Dr. Emmons, who told him that he had filled the root canal with Sargenti paste; and that he (Dr. Mcllwain) then made the following recommendation to Mrs. Dorton: “I felt that with her symptoms, that is, the pain that she was experiencing, the numbness that she was experiencing, that it would.be advisable for us to remove the material from its location.”
The next day, Wednesday, September 5, Mrs. Dorton went to Dr. Frank B. Morris, an endodontist, for a second opinion. Dr. Morris, in a written report, agreed with Dr. Mcllwain’s recommendation to remove the extruded Sargenti paste. She immediately telephoned Dr. Mcllwain, who admitted her to the hospital and performed a sagittal split osteotomy[5] that day to remove the extruded Sargenti paste. Dr. Mcllwain gave the following answer to a question about the necessity of the procedure:
“Well, I felt the material that had extruded out the end of the root would be toxic to the nerve. That is the nerve that supplies feeling to our jaw and our lip, and I felt that it should be removed from its close proximity to the nerve so as to avoid any permanent or lasting damage in that area.”
The hospital records, Dr. Mcllwain’s testimony, and Mrs. Dorton’s testimony all re-fleet that she experienced a reduction in the pain and numbness immediately after the surgery.
Because the Dortons present only the narrow issue of whether the trial court erred in denying their motion for a new trial on the “weight of the evidence” ground, we must address the applicable standard of review.
Our case of Jawad v. Granade, 497 So.2d 471 (Ala.1986), relating specifically to the standard for review of an order granting a new trial, established that an appellate court should reverse an order setting aside a jury verdict and ordering a new trial if “it is easily perceivable to the mind from the record that the jury verdict is supported by the evidence.” 497 So.2d at 477. The Court continued:
“By adopting this rule, we do not mean to preempt the trial court’s right to grant a new trial when the verdict is against the great weight and preponderance of the evidence.”

Id.

Jawad did not change the standard for review of an order denying a motion for a new trial on the ground that the verdict was against the great weight and preponderance of the evidence. That standard is that the denial of a new trial
“will not be reversed, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it is wrong and unjust.”
Jawad, at 474, quoting Cobb v. Malone, 92 Ala. 630, 635, 9 So. 738, 740 (1891); see also Cloverleaf Plaza, Inc. v. Cooper & Co., 565 So.2d 1147 (Ala.1990); and Gavin v. Hinrichs, 375 So.2d 1063 (Ala.1979).
The court, in its order overruling the Dortons’ motion for new trial, gave only the following response:
*429 “The case was diligently tried by the parties, the material issues of fact were disputed and were submitted to a duly empanelled jury for their consideration. The jury’s verdict was that the Plaintiffs were not entitled to recover against the Defendants and
“It is the Order of the Court that the verdict of the jury is presumed to be correct, that the verdict of the jury should be upheld and Plaintiffs’ Motion should be overruled and denied.”
The fact that “the material issues of fact were disputed” simply establishes that there was sufficient evidence to submit the case to the jury; it does not refute the plaintiffs’ argument that the great weight and preponderance of the evidence is against the verdict. The order suggests more that the trial court gave full weight to the presumption in favor of the verdict than that it judicially considered the evidence to determine if the verdict was “wrong and unjust.”
The Dortons presented expert testimony from Dr. Mcllwain, the oral surgeon who removed the Sargenti paste from her mandible; Dr. Morris, the endodontist who gave her a second opinion that the paste needed to come out; and Dr. Robert Bar-field, the chairman of the department of endodontics at the University of Alabama in Birmingham School of Dentistry. The defendants presented the expert testimony of Dr. Emmons and that of Dr. Alvin Arzt, a general dentist from Pennsylvania who advocates the use of the Sargenti technique for root canals. All of the experts agreed that a general dentist may properly perform root canals, but, when doing so, should be held to the same standard of care as that for an endodontist, a specialist whose primary specialty is the performance of root canals.
Dr. Mcllwain, Dr. Morris, and Dr. Bar-field all spoke strongly against the use of Sargenti paste, while Dr. Emmons and Dr. Arzt spoke in favor of its use. Dr. Barfield testified that no dental school in this country advocates, teaches, or recommends the Sargenti method of doing root canals. He cited over half a dozen authoritative publications giving warnings and admonitions against its use and demonstrating its harmful effects. Dr. Morris testified that there was nothing positive about Sargenti paste in any authoritative literature. Both he and Dr. Barfield testified that they had removed Sargenti paste in “many cases” where patients had developed problems after root canals with Sargenti paste.[6]
Dr. Arzt and Dr. Emmons described the following advantages of using Sargenti paste: (1) the Sargenti paste would fit into a smaller canal than was necessary for the other common filling material, Gutta-per-cha, so a Sargenti root canal required less filing of the tooth; (2) if the nerve in the tooth was not decayed all the way to the apex of the tooth, the delicate and irritating filing to the end of the tooth need not be performed, because the Sargenti paste would cauterize the residual nerve tissue; and (3) the bacteriacidal properties of the Sargenti paste would kill any remaining infection, and, in the standard Sargenti technique, allowed less debridement of the canal (Dr. Emmons testified that he did not use the Sargenti technique to substitute for debridement).
The Dortons’ experts did not contradict the first of the advantages listed above, but they severely criticized the second and third ones. Dr. Barfield testified:
“I think that using a chemical to do the work in a root canal is not appropriate, especially chemicals that are severely toxic or embalming type materials or in this case, there is lead and steroids and a lot of other things put together that are supposedly in there to react with nerve tissue and bacteria to sterilize and to create healing and to seal the root canal.
*430 I think it is impossible to think that one material can satisfy all those criteria.” Dr. Morris testified:
“Well, the main objection that I have to the material ... is that you can’t control the material_ It has the consistency like toothpaste. You squirt it out, you can’t take it back. So that is one huge disadvantage, to my mind, that the material has. Another problem is the constitutent materials in it, particularly the paraformaldehyde and the lead tetroxide. It has some other ingredients that I have never really been able to figure out why they are there. But the paraformaldehyde is a dangerous material.”
Dr. Emmons testified that he learned the Sargenti technique from the dentist with whom he practiced for approximately his first year out of dental school, and that that dentist had a clinical history of performing Sargenti root canals with a high success rate and “minimal discomfort,” although he did not know if that dentist had follow-up records of overall healing. He testified that, prior to Mrs. Dorton’s root canal,, he had performed 200-250 root canals, all with Sargenti paste. Dr. Arzt gave extensive testimony about his personal practice with Sargenti paste and about its use “by almost 40,000 general dentists in the United States today.”
Dr. Barfield, when asked if he knew of any endodontic specialist who used Sargen-ti paste, answered, “Certainly not.” Dr. Barfield testified that his and other endo-dontists’ opposition to Sargenti paste was not based on opposition to general dentists performing root canals. On the contrary, he testified that the dental school taught all students to perform root canals with Gutta-percha, that the school encouraged students entering general dentistry to perform root canals, and that, in fact, most root canals (the figures of ⅜ and 85% were given) are performed by general dentists.
Thus, there was substantial evidence that the use of Sargenti paste in root canals violates the standard of care. The evidence tended to indicate that, if the paste remains in the tooth, no symptoms of harm from it may develop, at least for some time. We need not decide in this case, however, whether any injury proximately resulting from the use of such paste, such as the gradual migration of the paste out through the apical foramen, the hole at the end of the tooth, would necessarily result in an award of damages to the plaintiff. In this case, Dr. Emmons saw the extrusion on the X-ray immediately after filling the canal and, even accepting his testimony that he told Mrs. Dorton of the extrusion, it is undisputed that he did not tell her of its toxic properties or recommend any treatment to correct it. The overwhelming weight of the testimony was that his failure to recommend removal of the paste, at least when Mrs. Dorton complained of worsening pain and numbness, was beneath the standard of care.
In answer to the question, “In your opinion, would the failure to remove the extruded material that you saw be beneath the standard of care for a dentist doing root canal procedures?” Dr. Morris answered:
“There would be some experts, people that I would respect that would argue vehemently that in every case that this material is extruded from anywhere, that it ought to be removed. I am not so sure that I stand quite that hard. I wouldn’t be comfortable saying in any case that the material shouldn’t be removed. But in this particular case, the reason that she was having the problem she was having, in my opinion, was because this Sargenti paste was impinging upon the inferior alveolar nerve and artery. The material was the problem. Until something was done about the material, I didn’t see any prospects at all of her improving.”
His testimony continued:
“Q. Doctor, do you have an opinion as to whether or not leaving the material that you observed in Marianne Dorton’s jaw present without either telling her about it or attempting to remove it was beneath the standard of care ordinarily practiced by dentists doing root canals, or not?
[[Image here]]
*431 “A. I would say that would be beneath the- standard of care.”
Dr. Mcllwain testified similarly:
“Q. In your opinion, would a dentist who had done a root canal ordinarily leave extruded Sargenti paste filling such as you observed without telling the patient or making an attempt to get the paste removed after becoming aware that the patient was suffering extreme pain and numbness?
[[Image here]]
“A. I would think that the dentist would want to tell the patient what had happened.
“Q. And what about removing it?
“A. And would desire its removal.
“Q. As soon as possible?
“A. Yes, sir.”
Dr. Barfield answered a hypothetical question that began with the facts of Mrs. Dorton’s root canal, including the extruded Sargenti paste and her return with complaints of numbness and pain, and continued:
“[AJssume further that the Defendants never informed Marianne Dorton that the material used was N-2 and never advised her of the toxic nature of the material nor made an attempt themselves to remove the material or to refer her to some other person for help, and that she finally found an oral surgeon without their help who proceeded to give her relief by surgically removing as much of the material as he could. Based on those assumptions ... state whether or not you have an opinion as to whether or not such [treatment meets the standard of] reasonable care, diligence, and skill as dentists in the same [general] line or practice in the field of endodontics ordinarily have and practice?
[[Image here]]
“A. Yes, I have an opinion.
“Q. What is that opinion?
[[Image here]]
“A. I believe that the only way a reasonably prudent person could look [at] that is that it is a gross failure in not informing the patient what is the risk or the benefits of a procedure, carrying it out....
[[Image here]]
“Q. Doctor, I ask you again: State whether or not the conduct that has been set forth in the hypothetical question to you would be the conduct of a reasonable dentist in the same line of practice....
[[Image here]]
“A. I believe it is certainly below the standard not to address this situation.”
Dr. Arzt, for the defendants, testified on direct examination that he would often wait six months to a year before treating an extrusion, because extrusions often resolve themselves. On cross-examination, however, he testified as follows:
“Q. Did I understand you to say that, now, it would be standard practice to wait about six months before trying to remove it or do anything about it?
“A. From my experience and from our American Endodontic Society’s[7] experience, we are finding that extrusions within six months, even up to two years will very often resolve themselves.
“Q. Would this be true in your opinion, Dr. Arzt, even though the patient was complaining of extreme pain and cried and [was] not able to sleep, and had gone back to the dentist?
“A. If it was my patient, I would probably extract the tooth, and that would be the end of it because if they had that much pain, rather than subjecting them to surgery, I would take the tooth out and be prepared to put in a fixed bridge.”
Dr. Emmons’s only testimony tending to explain or to justify his lack of treatment or advice relative to the Sargenti extrusion and to Mrs. Dorton’s post-endodontic complications was that he did not think the Sargenti paste was close enough to the *432 alveolar nerve to cause problems and that he thought he might have inadvertently “nicked” the alveolar nerve in giving her an injection of anesthetic.
This evidence, however, can hardly be said to raise a factual inference in opposition to the plaintiff’s prima facie case, particularly in light of Dr. Emmons’s knowledge of the dangerous propensities inherent in the use of Sargenti paste and his subsequent opportunity to observe Mrs. Dorton’s adverse reaction thereto. Even more telling is the total lack of any evidence by either Dr. Emmons or his expert witness to the effect that his subsequent treatment or advice (or lack thereof) was professional conduct within the standard of care under the attendant circumstances.
The defendants argue that the testimony of two of the Dortons’ expert witnesses furnished factual inferences that create conflicting evidence and thus support the jury verdict: First, they point to Dr. Morris’s testimony that a dentist is not necessarily negligent if he overfills a root canal; and, second, they direct our attention to Dr. Mcllwain’s testimony during cross-examination to the effect that Mrs. Dorton’s numbness may have been caused by an infection, the abscessed tooth, the injection of anesthetic, or the toxic paste.
Dr. Morris’s testimony that overfilling of the root canal, which “sometimes” occurs, is not in itself negligence was given as his explanation of why he chooses a non-toxic as opposed to a toxic filler: “And with the fact that every once in a while you are going to overfill a root canal, you don’t want to use a material that is going to injure the patient if the canal is overfilled.”
Dr. Mcllwain’s testimony had nothing to do with excusing the conduct of the defendants in their post-root canal treatment of the plaintiff. He was simply answering an abstract question concerning the various possible causes of the numbness and pain that Mrs. Dorton had presented on her initial visit to him. As we have already observed, once Dr. Mcllwain was made aware of Mrs. Dorton’s symptoms he unambiguously recommended surgical removal of the Sargenti paste, and that recommendation was seconded by Dr. Morris. Once Dr. Mcllwain had surgically removed the toxic filler, Mrs. Dorton experienced almost immediate relief from her “deep throbbing pain,” and she thereafter experienced a decrease in the numbness.
Perhaps the jury’s verdict for the defendants resulted from Mrs. Dorton’s statement in her deposition that she felt numbness after her first visit to Dr. Emmons, before he put the Sargenti paste in the canal. She stated unequivocally at trial that the numbness in her chin and lip started after the Sargenti paste was inserted on August 26, and stated that she had simply been confused on the day she gave her deposition. The defendants cross-examined her vigorously on this point. They further elicited testimony from the Dortons’ experts that it could not be said to a medical certainty that the Sargenti paste was the sole cause of her pain and numbness. Even if the facts found by the jury were based on those permissible inferences most favorable to the defendants, however, those facts would not prevent the verdict from being contrary to the evidence, for the following reasons.
Dr. Barfield testified that the Sargenti paste was “a competent producing cause” of the numbness. Dr. Mcllwain testified, “I felt that the substance in addition to the infection which she had, was causing her symptoms and the numbness which she was experiencing.” Dr. Barfield testified that, although nicking the nerve during an anesthetic injection might have caused numbness, it could not have caused the pain that Mrs. Dorton continued to experience after the root canal. Most important, the removal of the infected tissue during the root canal and the passage of time after the injection would have caused the pain and numbness to decrease if they had resulted from either of those causes, whereas they in fact increased until the Sargenti paste was surgically removed.
Thus, the great weight and preponderance of the evidence, if not all of the permissible inferences and facts sustainable from the evidence, are contrary to the verdict rendered for the defendants. *433 Based on our review of the record, we conclude that the denial of the motion for new trial was error, and we therefore reverse the judgment and remand the cause for a new trial.
APPLICATION GRANTED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
JONES, ALMON, SHORES, ADAMS and KENNEDY, JJ., concur.
MADDOX and STEAGALL, JJ., dissent.

. Mr. Dorton’s claim was for loss of consortium.

. The ingredients in Sargenti paste include para-formaldehyde, lead tetroxide, and steroids.

. "Root canal therapy, generally speaking, consists of three steps. The first step is debridement or mechanical cleansing of the canal. In this step, the pulp tissue is removed from the pulp chamber and the root canal.... Following the removal of the pulp tissue, the root canal is reamed and shaped to accept a filling material.
"The second step in root canal therapy is chemical disinfection. In this step, the crown and root canal where the pulp has been removed are irrigated or various chemicals are placed in the tooth. Regardless of technique, the purpose of this step is to rid the interior of the tooth of bacteria.
"The final step in the root canal procedure is the obturation or filling of the void space in the tooth. The purpose of obturation is to provide a seal between the peripheral tissue at the apex of the root and the oral cavity. Obturation is generally accomplished by one of three methods.
“One method is the so-called silver point method. In this method, a silver wire is inserted into the root canal and cemented in place using an inert cement. The second method is referred to as gutta percha. This method also consists of the placement of an inert substance into the pulp chamber and root canal.
“The third method is the Sargenti technique. This method differs from silver point and gutta *427 percha in that the filling substance, usually called Sargenti paste, contains an active ingredient. This active ingredient, paraformaldehyde, is a bacteriacidal agent. Sargenti paste, in its most common formulation, also contains zinc oxide as an inert filler and bismuth as radio-paque material. Each of these ingredients is in powder form which is mixed with a liquid, eugenol, to achieve a paste-like consistency. Following insertion into the tooth, this paste becomes semi-hard. As with the other methods, complete obturation is the goal. However, the void should not be overfilled with Sargenti paste since it is not desirable to force the paraformal-dehyde beyond the apex of the tooth into the surrounding tissue. Thus, slight underfilling is preferred to overfilling. It is also thought that satisfactory results can be obtained with slight underfilling since the paste contains an active ingredient to fight infection." United States v. Talbott, 460 F.Supp. 253, 257 (S.D.Ohio 1978), aff’d, 590 F.2d 192 (6th Cir.1978); The Sloane-Dorland Annotated Medical Legal Dictionary at 725 (1987).

. Mrs. Dorton testified that, because September 2 was Labor Day, September 3 was her first opportunity for further treatment after Dr. Cashion had refused to treat her on Saturday, August 31.

. A surgical procedure whereby he cut away a portion of her mandible, removed as much of the paste as he could from around the nerve, irrigated the area to remove or neutralize more of the Sargenti paste, and replaced the bone.

. Cf. Thornton v. Mahan, 423 So.2d 181 (Ala.1982), in which a patient who had received a Sargenti root canal brought an action after she developed holes in her face near the root canal and had the paste surgically removed. The only issue in that appeal concerned the admissibility of a magazine in an attempt to prove the Food and Drug Administration’s failure to approve Sargenti paste. This Court held that the trial court properly refused to admit the magazine, which was hearsay as to the fact sought to be proved.

. A society composed primarily of general dentists who advocate the use of Sargenti paste. This society is not to be confused with the American Association of Endodontists, "sanctioned as the specialty group in endodontics by the American Dental Association," according to Dr. Barfield.